UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DORRIS MARKETING GROUP | ) | Case No. 03-15025-SSM |
| | ) | Chapter 7 |
| Debtor | ) | |
| | ) | |
| GORDON P. PEYTON, TRUSTEE | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 04-1322 |
| | ) | |
| EDWARD DORRIS, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**


This is an action by the chapter 7 trustee of Dorris Marketing Group to pierce the

corporate veil and hold the debtor's principal, Edward K. Dorris, and his wife, Nancy

Dorris, liable for the allowed claims in this case, or, in the alternative, to recover as either a

fraudulent conveyance or a voluntary conveyance money transferred to them from the

business's bank accounts.[1]   For the reasons stated, the court will enter judgment in favor of

the trustee piercing the corporate veil.  This opinion constitutes the court's findings of fact

and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

---

[1] As will be discussed, the trustee orally moved at trial to amend the complaint to add a
count for avoidance and recovery of unauthorized post-petition transfers.

Procedural Background and Findings of Fact

I.

Dorris Marketing Group ("the debtor" or "DMG") was engaged in the business of fund-raising for non-profit organizations.[2]  It filed a voluntary petition under chapter 7 of the Bankruptcy Code in this court on November 4, 2003, and Gordon P. Peyton was appointed as trustee.

Shortly prior to the bankruptcy filing, an arbitration award had been entered against DMG on October 7, 2003, in the amount of $1,033,401.57, plus $4,471.02 in administrative costs in favor of the American College of Dentists Foundation ("ACDF").[3]  ACDF had contracted with DMG in 2000 to conduct a fund-raising campaign.  More specifically, ACDF and DMG had entered into two contracts.  The first, in June 2000, was for a pre-campaign study to determine the feasibility of a fund-raising campaign.  The second, in October 2000, was to conduct the campaign itself.  The campaign fell far short of its $1.3 million goal, having brought in only $232,000 in pledges, at a cost to ACDF of $207,000 in fees and $29,804.83 in expenses paid to DMG.

---

[2]  During the time frame at issue, DMG held itself out as a professional fundraiser registered in the states of Virginia, Maryland, Illinois, Indiana, and Minnesota.  Although DMG did file the appropriate registration forms in Virginia, certifications introduced at trial from Maryland, Illinois, Indiana, and Minnesota, reflect that DMG was not registered in any of those states.

[3]  After the bankruptcy was filed, this court granted ACDF relief from the automatic stay in order to seek confirmation of the arbitration award in the United States District Court for this district.  The District Court in turn referred the confirmation action to this court, which confirmed the award and entered judgment against the debtor on April 13, 2005.

Matters came to a head between the debtor and ACDF in July 2002, when ACDF

filed a lawsuit against Edward Dorris in the United States District Court for the Eastern

District of Virginia.[4]  After considerable discovery and wrangling, that suit was dismissed

without prejudice in November 2002.  In January 2003, ACDF filed a second lawsuit in the

District Court, this time against Edward Dorris and "DMG, Inc."[5]  After the District Court

granted summary judgment in favor of the defendants on four of the five counts, ACDF

voluntarily dismissed the remaining count.  Prior to the dismissal of the case, a consent order

was entered severing from the case all issues as to the alleged liability of corporate officers

and directors for any judgment debt against Dorris Marketing Group, Inc.

The current company known as DMG was incorporated in Virginia on November 14,

2002, after Mr. Dorris learned, in the course of the litigation with ACDF, that a prior Indiana

corporation of the same name that had been incorporated in 1998 (and was the entity with

which ACDF had contracted) had been administratively dissolved in December 2001.

Although Mr. Dorris held himself out as the president and owner of DMG in both its Indiana

and Virginia manifestations, there is no record of any organizational meeting having ever

been held, of any stock having ever been issued, or of any by-laws having been adopted.

Prior to the incorporation of DMG in Indiana, Mr. Dorris had carried on business through a

company called Dorris & Associates, Inc., which had been incorporated in Indiana on March

9, 1995, and was administratively dissolved on January 8, 2001.  Dorris & Associates, Inc.,

was in turn the successor to an unincorporated company called Dorris & Associates that had

---

[4] *American College of Dentists Foundation, Inc. v. Dorris*,  No. 02-cv-1010-A.

[5] *American College of Dentists Foundation, Inc. v. Dorris, et al.*, No. 03-cv-125-A

3

existed in some form since the early 1990s.  DMG, both in its Indiana and Virginia

incarnations, never obtained its own Federal tax employer identification number (EIN) but

simply continued to use the EIN assigned to Dorris & Associates, Inc.

Although Mr. Dorris was clearly the driving force behind DMG, Mrs. Dorris was by

no means uninvolved in the business. The evidence shows that Mrs. Dorris was consistently

identified as an officer of DMG and its immediate predecessor, Dorris & Associates, Inc.,

and that employees considered her a manager of the company.  Mrs. Dorris was named as an

initial director of Dorris & Associates and on February 28, 1995, signed a unanimous written

consent of the Board of Directors electing her as secretary of the company.  In 1998, she was

named as an initial director of DMG in the Articles of Incorporation filed with the Indiana

Secretary of State. On January 8, 1999, she signed an application to open a SmithBarney

corporate account as secretary of DMG.  On her 1999 personal income tax return she listed

her occupation as "Vice President." Since no other business entity is identified on the return,

it can reasonably be assumed that she meant vice president of DMG.  On her 2000 income

tax return Mrs. Dorris again listed her occupation as "Vice President."  In fact, on the

Virginia Registration Form for Professional Fund-Raising Counsel Mrs. Dorris was again

listed as Vice President of DMG.    Although Mrs. Dorris testified that she was never an

employee of DMG, she was a participant in the company's 401K plan.  In 2000, she

participated in a client presentation for a fund-raising campaign that DMG ran for Beta Rho

of Gamma Phi Beta sorority and was identified on the promotional materials as "Campaign

Coordinator."  Ms. Dorris also engaged in other business activities including managing

employees, answering telephones, and occasionally signing payroll checks.

Notwithstanding the nominal existence of DMG as a corporation, the Dorrises treated

the company for all intents and purposes as a sole proprietorship.  Indeed, for the tax years

1998, 1999, 2000, and 2001, the Dorrises filed personal Federal income tax returns reporting

all of the company's income and expenses on Schedule C, "Profit or Loss From Business

(Sole Proprietorship)."  Only after the filing of the bankruptcy case did Mr. Dorris cause

corporate tax returns to be filed for DMG (using the tax identification number for Dorris &

Associates, Inc.) for the years 2000 and 2001.  He did not, however, file amended personal

returns for those years.

Most astonishing of all, neither DMG nor its predecessors had a bank account

separate from that of Mr. and Mrs. Dorris.  At any given time, Mr. Dorris maintained only a

single bank account—first in Old National Bank, Zionsville, Indiana ("Old National"),[6] then

in Virginia Commerce Bank, Alexandria, Virginia ("Virginia Commerce")—on which

checks were written to pay both business and personal expenses.  The Old National Account

was titled "E. K. Dorris, Dorris and Associates." The Virginia Commerce account was titled

"Edward Dorris, Nancy Dorris, DBA Dorris Marketing Group." Checks written on the Old

National account were variously imprinted "Dorris & Associates, Inc.," "Dorris Marketing

Group," and "E. K. Dorris, Dorris and Associates."  Although at one point separate sets of

checks were printed for the Virginia Commerce account—one set showing Mr. and Mrs.

---

[6]  During part of this period, the bank was known as American National Bank and Trust
Company.  However, since the account maintained there was routinely referred to in the
testimony as the Old National Bank account, the court will do the same.

Dorris as the account holders and the other showing DMG as the account holder—there was

no consistent practice of using "company checks" for business expenses and "personal

checks" for personal expenses.  Rather, Mr. and Mrs. Dorris both routinely paid personal

expenses with checks imprinted with the company's name.  These expenses included large

payments—$66,500 in 1999, $150,000 in 2000, and $40,000 in 2001—to the Internal

Revenue Service for their personal income tax liabilities as well as a $10,000 college

graduation gift for their son Ryan.  Money from this account was also used to pay rent for

office space used by an event planning business called Orvieto Group that Mrs. Dorris

owned and operated.[7]  The Dorrises also each had a corporate American Express

card—indeed Mrs. Dorris had *two* such cards —which they routinely used to pay for

personal expenses, such as vacation travel.  The American Express bills were entirely paid

from the checking account.  No accounting records exist to show that the Dorrises ever made

the slightest attempt to segregate their personal expenditures from those of DMG.  Rather

Mr. Dorris's testimony was that at the end of the year, he simply sat down with the

checkbook and the American Express statements and totaled up what he considered

company income and expenditures and what he considered personal, and used those totals to

prepare his tax returns.  No work papers or other backup documents exist reflecting or

memorializing his analysis.  Indeed, Mr. Dorris did not preserve *any* of the checkbooks,

---

[7] According to Mrs. Dorris' testimony, Orvietto Group was incorporated in 2002, and she is
the sole shareholder, officer and director of the company.

6

bank statements, cancelled checks, and American Express statements that were allegedly used to prepare the returns, and he is unable today to duplicate the calculations.[8]

DMG never had any capital or retained earnings.  Mr. Dorris testified that his practice at the end of each calendar year was to "zero out" the company's cash by treating the end-of-year checking account balance as personal income.[9]  After the bankruptcy petition was filed, he hired an accountant to prepare after-the-fact returns for DMG for 2000 and 2001.[10]  These returns reflect no capital stock, no additional paid-in capital, and no retained earnings.  Each shows a zero cash balance at the beginning of the year and a zero cash balance at the end of the year.

In addition to the "joint" personal and business checking account, three investment accounts were maintained at SmithBarney during the 1999-2002 time frame.  The first of these was titled in the name of Dorris Marketing Corp. [*sic*]; the second in the name of Edward K. Dorris and Nancy A. Dorris, JTROS; and the third in the name of Nancy A. Dorris.  Large sums of money—$390,000 in 1999, $332,000 in 2000, $401,000 in 2001, and $70,000 in 2002—were transferred from the checking account into the "Dorris Marketing Corp." account at SmithBarney, with occasional smaller transfers from the SmithBarney

---

[8]  The copies of the bank statements and American Express statements used at the trial were subpoenaed by the trustee from the respective banks and from American Express after Mr. and Mrs. Dorris failed to produce any of them.

[9]  The "zeroing out" was largely, if not entirely, a mental exercise, since cash was not actually withdrawn from the account at the time the "zeroing out" occurred and there is likewise no evidence of contemporaneous bookkeeping entries having been made.

[10]  Since there were no business records from which the returns could be independently prepared, the accountant simply used and recast the figures shown on Mr. and Ms. Dorris's Schedule C for those years.

account back into the checking account.[11]  Amazingly, Mr. Dorris testified that the "Dorris Marketing Corp." account at SmithBarney, notwithstanding the way it was titled, was actually a personal account and that all the funds in the account were personal, not company funds.   However, he could give no coherent explanation why this supposedly "personal" account bore the company name or why he would need a third personal account when there were two other accounts titled in his and his wife's name.

In 2001, $933,000 was transferred from the Dorris Marketing Corp. account at Smith-Barney into the Edward and Nancy Dorris account at SmithBarney.  $500,000 from that account was used to buy a house—for which the Dorrises paid cash—when they moved to Virginia.  An additional $428,00 from the joint SmithBarney account, together with an additional $184,000 from the SmithBarney account solely in Nancy Dorris's name, was transferred to two accounts at ING, one in Mr. Dorris's name ($300,000) and the other in Nancy Dorris's name ($311,000).  In January 2004, three months after the bankruptcy was filed, $412,000 was transferred from Nancy Dorris's ING account into a Capital One account.  $577,280.97 had previously been deposited into the Capital One account in September 2003—the source of those funds is unclear from the record.  In any event, $870,000 was transferred from the Capital One account in April 2004 into an account solely

---

[11]  The net transfers for the year in question may be summarized as follows:

| Year | To SmithBarney | From SmithBarney | Net Outflow |
|------|----------------|------------------|-------------|
| 1999 | $390,000 | $55,000 | $335,000 |
| 2000 | $332,000 | $85,000 | $247,000 |
| 2001 | $410,000 | $70,000 | $340,000 |
| 2002 | $70,000 | $0 | $70,000 |
| Totals | $1,202,000 | $210,000 | $992,000 |

in Nancy Dorris's name at Fifth Third Bank.  That same month, the Dorrises sold their house

in Virginia—which had been titled in their joint names—and deposited the $652,000 in sales

proceeds into Nancy Dorris's account at Fifth Third Bank. The Dorrises then purchased a

new home in Indiana and, according to Nancy Dorris, the $227,000 purchase price was paid

out of the Fifth Third Account.  The new home was titled solely in the name of Nancy

Dorris.  The property was titled this way at the suggestion of Mr. Dorris.[12]  In fact, the record

shows that virtually all of the financial assets of the Dorrises are currently maintained or

invested in accounts and real property solely in the name of Nancy Dorris, and the Dorrises

pay all of their personal living expenses out of Nancy Dorris's Fifth Third Bank account.[13]

## Conclusions of Law and Discussion

### I

The trustee seeks a ruling piercing the corporate veil of DMG so as to hold Edward

and Nancy Dorris liable for the debts of the corporation (Count II).[14]  Alternatively, if the

---

[12]  Mrs. Dorris testified that she and Mr. Dorris had been married for thirty years and had previously owned four homes.  Each had been jointly owned.

[13]  Edward Dorris claims that he has no personal expenses.

[14]  The filed proofs of claim total $1,244,583.30.  However, two of these—totaling $157,411.22—were filed after the claims bar date.  One of the late-filed claims is that of the Internal Revenue Service, which asserts a priority unsecured claim of $46,476.94 and a general unsecured claim of $6,641.81.  The priority claim, although late filed, is nevertheless entitled to distribution on a par with timely-filed claims.  § 726(a)(1), Bankruptcy Code. Additionally, since neither the IRS nor the other creditor (American Express) that filed a claim after the bar date was listed on the schedules, even their general unsecured claims might be entitled to a distribution with timely-filed claims if they can establish that they "did not have notice or actual knowledge of the case in time for timely filing of a proof of ... claim."  § 726(a)(2)(C).  At a minimum, therefore, the allowed claims (including the tardily-
(continued...)

9

corporate fiction is upheld, he seeks recovery of funds transferred from the corporation to

their personal accounts as either fraudulent or voluntary conveyances (Count I), and also

seeks to add a count (Count III) for avoidance of unauthorized post-petition transfers.

A.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and

the general order of reference from the United States District Court for the Eastern District

of Virginia dated August 15, 1984.  Venue is proper in this district under 28 U.S.C.

§ 1409(a).  The defendants have been properly served and have appeared generally.

The avoidance claim raised in Count I and the avoidance claim that the trustee seeks

to add are clearly core proceedings with respect to which a bankruptcy judge may issue a

final judgment or order.  28 U.S.C. § 157(b)(2)(H).  The veil piercing claim is more

problematic.  The complaint alleges that those claims, if not core, at least fall within this

court's "related to" jurisdiction.[15]  The answer takes the position that "no response is

required" to the jurisdictional allegation, but that to the extent a response is required, the

jurisdictional allegations are denied.[16]

---

[14](...continued)
filed priority claim) entitled to a distribution total $1,133,649.02, and they could be as great
as $1,244,583.30.

[15]  A cause of action is "related to" a bankruptcy case within the meaning of 28 U.S.C. §
1334 if "the outcome of that proceeding could conceivably have any effect on the estate
being administered" or "could alter the debtor's rights, liabilities, options, or freedom of
action." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984).

[16]  The defendant's position that "no response is required" to the jurisdictional allegations is
quite wrong.  The answer in an adversary proceeding must "admit or deny an allegation that
the proceeding is core or non-core" and, if the response is that the proceeding is non-core,
the response must "include a statement that the party does or does not consent to entry of

(continued...)

10

While the court agrees with the trustee that the veil piercing claims fall within the court's "related to" jurisdiction, related claims are by definition non-core.[17]  That does not deprive this court of jurisdiction to try the claims but would ordinarily require that any judgment be entered by the district court after submission by this court of proposed findings of fact and conclusions of law.  28 U.S.C. § 157(c)(1).  A bankruptcy judge may, however, enter final judgment in a non-core matter if all parties consent.  28 U.S.C. § 157(c)(2). While neither side has explicitly consented to this court's entry of a final judgment on Count II, no party has voiced any objection either, and all parties have proceeded as if this court had such power.  *See McLean Square Assocs. v. J. W. Fortune, Inc. (In re McLean Square Assocs.)*, 200 B.R. 128 (E.D. Va 1996), *aff'd* 107 F.3d 866 (4th Cir. 1997) (holding that party who fails to object to bankruptcy court's jurisdiction in non-core related matter until after entry of final order has impliedly consented to the court's power); *Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 402–04  (4th Cir. 1992) (holding that failure of party to object to entry of dispositive order in related, non-core matter is an implied consent to bankruptcy judge's power to enter such order).  Accordingly, the court concludes that it has the power to enter final judgment on all counts.

B.

---

[16](...continued)
final orders or judgments by the bankruptcy judge." Fed. R. Bankr. P. 7012(b).

[17]  *See In re Systems Engineering & Energy Mgt. Assocs., Inc.,* 252 B.R. 635 (Bankr. E.D. Va. 2000) (holding that trustee's claims against debtor's shareholders on a veil piercing theory were non-core related proceedings). *But see St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) (holding that veil piercing claims to recover property of the estate are core proceedings).

In addition to pursuing the fraudulent transfer and veil piercing theories, the trustee seeks leave to amend his complaint to assert a claim for avoidance of unauthorized post-petition transfers under § 549, Bankruptcy Code.  The reason for adding such a count is that a number of the money transfers among the various bank and brokerage accounts occurred after DMG filed its bankruptcy petition—a fact the trustee only learned through discovery after he commenced  this adversary proceeding—and the trustee is apparently concerned that the fraudulent transfer count may reach only transfers that occurred before the date of the bankruptcy filing.[18]

Rule 15, Federal Rules of Civil Procedure, which is incorporated by Rule 7015, Federal Rules of Bankruptcy Procedure, provides in relevant part:

> (a) **Amendments.** A party may amend the party's pleading once as a matter of course . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

> (b) **Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the

---

[18]  If the trustee were proceeding under the Bankruptcy Code's own fraudulent conveyance provision, the concern would plainly be justified, since § 548, Bankruptcy Code, in literal terms allows avoidance only of transfers made "within one year *before* the filing of the petition" (emphasis added).  The trustee here, however, is proceeding under § 544(b), Bankruptcy Code, to invoke Virginia's fraudulent and voluntary conveyance statutes, Va. Code Ann. §§ 55-80 and 55-81.   It is far from clear that a trustee's power under § 544(b) to assert avoidance claims that could be asserted under state law by a creditor holding an allowable unsecured claim is limited to transfers that pre-date the bankruptcy filing. However, the court can hardly fault the trustee for being cautious.

> trial on the ground that it is not within the issues made by the
> pleadings, the court may allow pleadings to be amended and shall
> do so freely when the presentation of the merits of the action will
> be subserved thereby and the objecting party fails to satisfy the
> court that the admission of such evidence would prejudice the
> party in maintaining the party's action or defense upon the merits.
> The court may grant a continuance to enable the objecting party to
> meet such evidence.

The Fourth Circuit has explained that a motion to amend should be liberally granted and should

denied only "where the motion has been unduly delayed and where allowing the amendment

would unduly prejudice the non-movant." *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d

479, 481 (4th Cir. 1992) (quoting *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987), *cert. denied*,

485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 483 (1988)).

Given this liberal standard, this court has no reason not to allow the requested

amendment.  Although the motion to amend was not made until trial, the need for the

amendment did not become clear until the full extent of the money transfers was learned

through discovery.  *See In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d at 481; *Crossland v.*

*Canteen Corp.*, 711 F.2d 714 (5th Cir. 1983) (finding that trial court abused its discretion by

not allowing a party to amend its pleading mid-trial); *Robbins v. Jordan*, 181 F.2d 793 (D.C.

Cir. 1950) (allowing amendment to pleadings at the beginning of trial).

The Dorrises argue that the amendment comes too late and would prejudice their

ability to present a defense.  The court disagrees.  First, in large measure the delay is the

Dorris's own fault.  Throughout the discovery process the trustee's attempts to obtain bank

statements and other relevant evidence were impeded by the defendants—either because

they did not have the records or they were dilatory in providing them.  In the end, the trustee

had to subpoena records from the various banks and financial institutions that held the

13

Dorris's assets, a task not accomplished in full until nearly the eve of trial.  It is therefore not

surprising that the trustee did not appreciate until shortly before trial the need to amend his

complaint to conform with the evidence being obtained.  Second, even if the delay could not

fairly be laid at the Dorrises' door, it is still difficult to see how they would be prejudiced.

Tracing funds into and out of the various bank accounts was a major focus of the trustee's

extensive discovery efforts,  and the Dorrises could hardly have been misled into thinking

they would not have to address the entirety of the transfers simply because some of them

occurred after the bankruptcy filing.  Although it is true that the elements for avoidance of

an unauthorized post-petition transfer are not identical with those under the Virginia

fraudulent and voluntary conveyance statutes, the underlying factual issues that would have

to be resolved are largely the same.   Accordingly, the court will allow the trustee to amend

his pleading to include a count for avoidance of postpetition transactions under § 549.

## II.

Because the preferred relief sought by the trustee is a judgment piercing the corporate

veil, the court will first address that count.  As noted, the trustee asserts that Dorris

Marketing Group was merely the alter ego of the Dorrises such that the court should pierce

the corporate veil and hold them personally liable to the company's creditors.

## A.

As an initial matter, the court notes that the complaint appears to treat "Alter Ego"

and Veil Piercing" as though they might be separate causes of action.  This is an incorrect

legal characterization.  The appropriate cause of action is known as "piercing the corporate

veil." *See, e.g., Fletcher v. Atex*, 68 F.3d 1451 (2nd Cir. 1995).  The veil piercing doctrine has

14

its origins in the "desire of courts to not permit investors to manipulate the statutory privilege of limited liability to the knowing disadvantage of those who deal with the corporation." *AE Restaurant Associates, LLC v. Giampietro* (*In re Giampietro*), 317 B.R. 841 (Bankr. D. Nev. 2004) (citing Robert B. Thompson, *Piercing the Corporate Veil* § 1:3 (2004)). The term "alter ego" refers to the theory adopted in some jurisdictions to determine *whether* to pierce the corporate veil. *Id.* (construing Delaware law); *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) (finding that the corporate veil should be pierced "where there is a fraud or where [it] is in fact a mere instrumentality or alter ego of its owners."). Other jurisdictions employ what is referred to as the "Van Dorn" test. *Van Dorn v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir. 1985) (analyzing Illinois law as requiring that: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice). Still other jurisdictions employ what has been termed the "Instrumentality Test" to determine whether to pierce the corporate veil. *See, e.g., Messick v. Moring*, 514 S. 2d 892, 894–95 (Ala. 1987) (requiring that: (1) the dominant party must have complete control and domination of the corporation's finances and business practice; (2) the control must have been misused by the dominant party; and (3) the misuse of this control must proximately cause the harm or unjust loss complained of). Virginia's veil piercing test, on its face and in its application, seems to be an amalgamation of these three tests, keeping as its principal focus the equitable considerations that undergird the veil piercing doctrine.

15

B.

As the Dorrises correctly note, the Virginia Supreme Court has set a very high bar for this type of action.  By piercing the veil, a court effectively casts aside the cloak of corporate limited liability—disregarding the statutorily created corporate fiction and imposing upon the shoulders of investors the very financial obligations from which they sought to be sheltered at the time of incorporation.  *Beale v. Kappa Alpha Order*, 192 Va. 382, 395, 64 S.E.2d 789, 796 (1951) ("The fundamental concept of a corporation is that it is a separate entity created under the law to enable a group of persons to limit their liability . . . to the extent of their contributions to the capital stock.")  There can be little doubt that a free-wheeling application of veil piercing would have a chilling effect upon corporate investors, thereby frustrating the fundamental economic policies that undergird the corporate scheme. *See Cheatle v. Rudd's Swimming Pool Supply Co.,* 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987).  Accordingly, such a remedy should be decreed only under the most egregious circumstances.

Noting these concerns, the Supreme Court of Virginia has consistently held that only an "'extraordinary exception' justifies disregarding the corporate entity and piercing the veil." *C.F. Trust, Inc. v. First Flight Limited Partnership,* 266 Va. 3, 10, 580 S.E.2d 806, 810 (2003) (quoting *Greenberg v. Commonwealth*, 255 Va. 594, 604, 499 S.E.2d 266, 272 (1998)). The Supreme Court of Virginia has also noted, however, that "[i]n the case of the one-man corporation or the corporation in which all stock is owned by a single individual except a few shares necessary to qualify directors, courts have shown great liberality in lifting the veil of the corporate entity and holding the sole shareholder and the corporation to

be one and the same." *Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 32, 147 S.E.2d

747 (1966) (quoting *Michie's Jurisprudence* § 5, at 95); *see also Levy v. Runnells (In re*

*Landbank Equity Corp.*), 83 B.R. 362, 371–72 (E.D. Va 1987).

In order to effectuate these policy choices, the Supreme Court of Virginia has

provided a broad analytical blueprint for deciding veil piercing cases in the Commonwealth:

> [N]o single rule or criterion can be applied to determine
> whether piercing the corporate veil is justified, and that the
> corporate entity will be disregarded and the veil pierced only if
> the shareholder sought to be held personally liable has
> controlled or used the corporation to evade a personal
> obligation, to perpetrate fraud or a crime, to commit an
> injustice, or to gain an unfair advantage.  Piercing the corporate
> veil is justified when the unity of interest and ownership is such
> that the separate personalities of the corporation and the
> individual no longer exist and to adhere to that separateness
> would work an injustice.

*C.F. Trust, Inc. v. First Flight Limited Partnership*, 266 Va. 3, 9–10, 580 S.E.2d 806, 809–10

(2003) (internal citations omitted).[19]  The Court further explained that "'[t]he decision to

disregard a corporate structure to impose personal liability is a fact-specific determination,

and the factual circumstances surrounding the corporation and the questioned act must be

closely scrutinized in each case.'" *Id.* at 10 (quoting *Greenberg v. Commonwealth*, 255 Va. at

604, 499 S.E.2d at 272).

---

[19]  The *C.F. Trust* case was before the Court by way of certification from the Fourth Circuit
Court of Appeals, and the precise issue to be decided was whether Virginia law recognized
the legal concept of reverse veil piercing—an action where the claimant seeks to reach the
assets, not of the individual, but of the corporation or some other business entity controlled
by the individual.  *See generally,* Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying
Appropriate Standards,* 16 J. Corp. L. 33 (1990).  In examining its own jurisprudence, and
that of other states, the Court found that "there is no logical basis upon which to distinguish
between a traditional veil piercing action and an outsider reverse piercing action."  *C.F.
Trust, Inc.,* 266 Va. at 810, 580 S.E.2d at 11.

The relevant factors Virginia courts have considered in applying the veil piercing doctrine include: (1) failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of corporate funds with personal funds; (3) undercapitalization of the corporation so as to frustrate creditors; (4) making fraudulent transfers of corporate funds by the dominant shareholder; (5) non-functioning of other officers and directors; and (6) breach of a fiduciary duty to creditors. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit* Co., 540 F.2d 681 (4th Cir. 1976); *Concrete Ready-Mix of Lynchburg, Inc. v. County Green Ltd. P'ship (In re County Green Ltd. P'ship)*, 438 F. Supp. 701 (W.D. Va 1977), *overruled on other grounds by In re County Green Ltd. P'ship*, 604 F.2d 289 (4th Cir. 1979); *Dana v. 313 Freemason*, 266 Va. 491, 587 S.E.2d 548 (2003); *Greenberg v. Commonwealth*, 255 Va. at 604–05, 499 S.E.2d at 272; *O'Hazza v. Executive Credit Corporation*, 246 Va 111, 431 S.E.2d 318 (1993); *Cheatle v. Rudd's Swimming Pool Supply*, 234 Va. at 213–14, 360 S.E.2d at 831–32; *Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 147 S.E.2d 747 (1966); *see also In re Kreisler*, 331 B.R. 364 (N.D. Ill 2005)*.

Even though the Supreme Court of Virginia has articulated an analytical framework for lower courts to apply, the Court has been somewhat less clear in explaining how the factors should be applied. However, the Court has provided some degree of clarification in its recent decision in *Dana v. 313 Freemason*, 266 Va. 491, 587 S.E.2d 548 (2003). There a condominium association filed suit against a condominium developer (a corporation) and its owners asserting several theories including actual fraud, fraudulent misrepresentation, constructive fraud, and breach of contract. *Id.* at 494, 587 S.E.2d at 550. The causes of action arose on account of a defect in the roof of a condominium complex owned and

18

operated by the corporation.  *Id.*  In affirming the trial court's ruling piercing the corporate veil, the Court noted that the owners of the corporation acquired the condominium property prior to forming the corporation.   *Id.* at 501, 587 S.E.2d at 554.  Moreover, the owners knew of the defects to the roof when the corporation was formed, and rather than obtaining replacement or repair of the roof, the shareholders simply formed a corporation to evade personal liability. *Id.* at 500, 587 S.E.2d at 554.

After brushing aside the fact that the owners had meticulously maintained the proper indicia and records for a corporation—i.e., articles of incorporation, by-laws, minutes of shareholder meetings, annual reports, and tax returns—the Court focused on the fact that the owners had never treated the corporation as a separate entity, finding that "the unity of interest and ownership was such that the separate personalities of Freemason (the corporation), Dana, and Hall (the shareholders) did not exist. . . . There is no evidence in the record that Freemason ever conducted the business of a corporation independently from that of its shareholders." *Id.*   In particular, the Court noted that when the corporation was formed, Freemason acquired the property from Dana in exchange for assuming his personal debt on the property.  Furthermore, the owners never established a checking account for Freemason, choosing instead to open a personal checking account to handle Freemason's financial affairs along with those of other personal ventures.   In sum, the Court found that Freemason was simply "the stooge or dummy of Dana and Hall." *Id.* (citing *Lewis Trucking Corp. v. Commonwealth*, 207 Va. at 31, 147 S.E.2d at 753).

In answering the second part of the test, the Court had to determine if "piercing the veil of the corporation was necessary to avoid an injustice." *Id.*  In answering this question in

19

the affirmative, the Court noted that "[o]ne of the principal factors we look to in resolving

the issue of piercing the veil of a corporation . . . is whether the inability of the corporation

to satisfy the judgment against it is the result of the deliberate undercapitalization by the

incorporating stockholders." *Id.*  As support for its finding the Court pointed to the fact that

instead of establishing a stand-alone corporate banking account,  the owners had simply

maintained a single personal checking account, which served not only as the deposit and

payment account for the corporation, but also as the account for other properties that the

owners individually owned and managed.  As a result, the Court opined, the corporation

itself "was never capitalized even in a *de minimis* amount." *Id.*  Given this fact, since the

corporation lacked funds to satisfy judgment creditors, it would work an injustice to allow

the shareholders to hide behind the corporate shield.  *Id.* at 501–02, 587 S.E.2d at 554–55.[20]

C.

The foregoing principles, when applied to the facts of the present case, readily

support  the piercing of the corporate veil.  First, as in *Dana*, the corporation behind which

the Dorris seek to hide was formed after the company's largest liability had been incurred.

Although DMG existed as an Indiana corporation prior to the contract with ACDF, it was

administratively dissolved on December 8, 2001.  DMG was reincorporated in Virginia on

November 14, 2002, several months after the contract dispute with ACDF arose and after

---

[20] The Supreme Court of Virginia has not provided a baseline of what it considers adequate
capitalization, however, the Court appears to require that no matter what the amount is, the
funds must be held in a segregated corporate account. The funds held in this account will be
considered part of the corporation's "capitalization."  *See Dana v. 313 Freemason*, 266 Va. at
501–02, 587 S.E.2d at 554–55; *O'Hazza v. Executive Credit Corp.*, 246 Va. at 111, 431
S.E.2d at 318 (finding that an initial investment of $10,000 held in the corporation's separate
account was sufficient capitalization).

litigation had begun.  When taken together, the facts and circumstances suggest that DMG's

incorporation in Virginia had little to do with DMG's continuation of business in Virginia as

an enterprise and everything to do with the Dorrises' attempt to escape personal liability on

the claims asserted by ACDF.   As the Supreme Court of Virginia suggested in *Dana*, it is

anathema to the equitable and economic principles that support corporate law to allow a

party to form a corporation after a liability is incurred simply to shield that party from

personal liability. *See Dana*, 266 Va. at 501, 587 S.E.2d at 554.

    The court must next consider whether "the unity of interest and ownership is such

that the separate personalities of the corporation and the individuals no longer exists."

*O'Hazza*, 246 Va. at 115, 431 S.E.2d at 320–21. It is without question that the Dorrises

exercised complete control over DMG.  The Dorrises were the sole directors, officers,

operators and purported shareholders—although no stock was ever issued—of the

corporation.[21]  Although Mrs. Dorris objects to the imposition of liability as to her on the

grounds that she was largely ignorant of and uninvolved in of the goings on of the business

and asserted no control over it, the record is clear that throughout the existence of DMG

Mrs. Dorris played a significant role.  Mrs. Dorris was named as an officer of the

corporation as either Secretary or Vice President, she signed her personal tax returns (which

treated DMG as a sole proprietorship) in that capacity, she occasionally signed payroll

checks for DMG, and she actively participated in fund-raising activities of the company.

Moreover, like Mr. Dorris, she had unfettered use of the company's bank accounts and

credit cards, which she used to pay not only for her own personal expenses but also office

---

[21] The Dorris's son Ryan was named as treasurer/secretary of the corporation in one
document.

21

space for her solely-owned and operated company, Orvietto Group.  Although Mrs. Dorris

was clearly not as fully involved in the day-to-day operations of DMG as her husband, she

nevertheless rather consistently used the corporation and its assets for her own personal

purposes.

    In addition, aside from its charter, DMG lacked even the barest indicia of

corporate existence.  There was no organizational meeting, no stock was ever issued, and no

by-laws were ever adopted.  Prior to the filing of the bankruptcy petition, DMG had never

filed a corporate tax return; instead the Dorris reported all of the business's income on their

personal tax returns as income from the operation of a sole proprietorship.  Quite simply, the

corporate formalities were so completely disregarded that to say creditors were even dealing

with a corporation would be a fiction of the first order. Based on the record before this court

there is no evidence that DMG "ever conducted the business of a corporation independently

from that of [the Dorrises]." *Dana*, 266 Va. at 501, 587 S.E.2d at 554.  In sum, DMG was

never more than the "stooge or dummy" of the Dorrises. *Id.* (citing *Lewis Trucking Corp. v.*

*Commonwealth*, 207 Va. 23, 31, 147 S.E.2d 747, 753 (1966).

    The only remaining question is whether piercing the corporate veil is necessary to

avoid an injustice. *Id.*  Several factors seem to be pertinent in the present case: (1) the

commingling of corporate and personal funds; and (2) deliberate undercapitalization of the

corporation.  As discussed, DMG's funds were completely commingled with the personal

funds of the Dorrises.  The Dorrises only maintained one account out of which they would

pay both business and personal expenses—including payments to the IRS for personal tax

liability and a $10,000 college graduation gift to their son.  The Dorrises also had three

corporate credit cards—two were held by Mrs. Dorris—which were used to pay for personal

expenses.  The bills for these cards were then paid out of the single checking account that

was maintained for them and the business.  Even the one account at SmithBarney that was

titled solely in the name of "Dorris Marketing Corp." is claimed to be—and was certainly

treated as—a personal account.

The failure of DMG and its predecessors to maintain a separate bank account is also

relevant to the undercapitalization inquiry.  As noted, the sole checking account was titled

either "E.K. Dorris, Dorris and Associates" (the Indiana account) or "Edward Dorris, Nancy

Dorris DBA Dorris Marketing Group" (the Virginia account).  Although in form this is

somewhat different from the situation in *Dana*, where the corporation never had a bank

account in its own name, in substance there is really no distinction.  By using a single

account out of which both personal and business expenses were indiscriminately paid, and

into which both personal and business funds were deposited, the corporation is left with no

identifiable assets.  Any creditor wishing to execute a judgment against DMG could only

look to the one commingled checking account—which was being used to pay for things such

as grocery bills, European vacations and business expenses of another business—to satisfy

its judgment.  This is the very evil that the *Dana* court identified and sought to prevent.

Even assuming (for the sake of argument) that the single checking account could be

considered a corporate account, the fact remains that the corporation was not merely

undercapitalized: it had no capital at all.  As already noted, at the end of each year Mr.

Dorris would "zero out" the company's cash—which was its only asset—and treat all funds

in the account as personal income.  As a result, DMG would begin each year with a "$0"

balance and at the end of the year would again report a "$0" balance.  Mr. Dorris calls this

practice "zeroing out;" however, a more accurate characterization would be stripping the corporation of its assets.  As even the after-the-fact 2000 and 2001 tax returns clearly reflect, during those years the corporation had no capital stock, no additional paid-in capital, and no retained earnings.  The record further reflects that this was the manner in which the corporation's finances were handled throughout its existence. Because any funds the business had at the end of the year were ultimately transferred into accounts in the Dorrises' own name, the corporation never had funds from which it could pay its just debts (unless the Dorrises voluntarily chose to put money back into the business, which they did from time to time, but only when it was in their best personal interest to keep the company going).  At bottom, DMG served no meaningful purpose other than to shield the Dorrises from personal liability to creditors such as ACDF.

While it is true that the Supreme Court of Virginia has been very hesitant to pierce the corporate veil and has stated that only an extraordinary exception justifies imposing the remedy, *see, e.g., Greenberg v. Commonwealth*, 255 Va. 594, 604, 499 S.E.2d 266, 272 (1998), the conduct of the Dorrises by using DMG as a shell merely to thwart its creditors presents just such an occasion.  The record clearly shows that the Dorrises: (1) disregarded corporate formalities; (2) used corporate funds for personal purposes; (3) intermingled personal and corporate funds; (4) failed to establish a dedicated corporate account; and (5) consistently stripped the corporation of any assets it may have had.  In fact, the record reflects that DMG was formed in Virginia not to continue an already existing business, but simply to allow the Dorrises to avail themselves of the corporate shield in order to protect personal assets from ACDF.  It would simply work an injustice to creditors to allow such

egregious behavior to go unchecked.  Accordingly, the court will enter judgment in favor of

the trustee piercing the corporate veil and imposing liability on the Dorrises in the amount of

the allowed claims in this case.[22]

III.

There remain the two counts (Count I and the added Count III) to recover from the

Dorrises the funds withdrawn from the business.  From the outset, the trustee has treated the

avoidance claims as alternatives to the veil piercing claim.  Indeed, since the very concept of

avoidance assumes a transfer from the debtor to some other person or entity, there is an

obvious conceptual problem where the transferor is an alter ego of the transferee.  (How

does one convey property to one's self?)  Because the court has found that there is sufficient

evidence to pierce the corporate veil and to hold the Dorrises personally liable for the debts

of DMG, the court need not reach the avoidance claims unless the judgment piercing the

corporate veil is reversed on appeal.  Accordingly, the court will dismiss Counts I and III as

moot, but without prejudice to their consideration in the event the judgment on Count II is

reversed on appeal.

---

[22]  Because, as noted, the final amount of claims that are entitled to a distribution has not
been finally determined, the court will enter judgment for the gross amount of the filed
claims but will retain jurisdiction to reduce the judgment to the extent any of the filed claims
are disallowed or are not payable on a par with timely-filed claims.

<u>Conclusion</u>

For the reasons stated above, this court holds that the trustee has carried his burden as to Count II of the complaint, and the court will pierce the corporate veil and hold Mr. and Mrs. Dorris personally liable for the debts and obligations of DMG.  The remaining claims will be dismissed without prejudice as moot.  A separate judgment will be entered consistent with this opinion.

Date: _____          _____
                                        Stephen S. Mitchell
Alexandria, Virginia                    United States Bankruptcy Judge

Copies to:

Kevin M. O'Donnell, Esquire
Henry, Henry, O'Donnell & Dahnke, P.C.
4103 Chain Bridge Road, Suite 100
Fairfax, VA  22030
Counsel for the plaintiff

Robert M. Gants, Esquire
Redmon, Peyton & Braswell, LLP
510 King Street, Suite 301
Alexandria, VA  22314
Co-counsel for the plaintiff

Bruce H. Matson, Esquire
LeClair Ryan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street
P.O. Box 2499
Richmond, Virginia 23218-2499)
Counsel for the defendants

Tara L. Elgie, Esquire
LeClair Ryan
225 Reinekers Lane, Suite 290
Alexandria, VA  22314
Co-counsel for the defendants